## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Nathaniel J. Arnold, being duly sworn, state as follows:

### Introduction and Agent Background

1.    I am a Border Patrol Agent (BPA) of the United States Border Patrol (USBP), a component of Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). I have been so employed since August 11, 2008. I have been assigned to the Richford, Vermont Station as a BPA for approximately 6 years and currently serve as the station's Prosecutions Agent. I was previously assigned to the Yuma, Arizona Border Patrol Station as a BPA for approximately 10 years.

2.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of an electronic device—further described below and in Attachment A—that are currently in the possession of the USBP and the seizure from these devices of the electronically stored information described in Attachment B. This warrant application arises from the USBP's contact with Loveprit Singh ("SINGH"), a citizen of India, on December 5, 2024, in the District of Vermont. As a result of this contact, a federal investigation commenced an investigation of SINGH for conspiring and attempting to transport of aliens in furtherance of their illegal entry in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) and 1324(a)(1)(A)(v)(I).

3.    The device to be searched is a metallic gray Apple iPhone (hereinafter the "DEVICE") seized from the person of SINGH on December 5, 2024. The DEVICE is currently in evidence storage at the Richford Border Patrol Station, which is located at 1668 St. Albans Road in Richford, Vermont.

1

4.    Based on my training and experience, the DEVICE has been stored in a manner such that the data on it will have remained intact and in the same condition they were at the time of the DEVICE'S seizure. The applied-for warrant would authorize the forensic examination of the DEVICE for the purpose of seizing electronically stored data, particularly described in Attachment B, that would evidence the aforementioned human smuggling and illegal entry offenses the user(s) of the DEVICE engaged in.

5.    In my experience investigating many human-smuggling cases, I have found that electronic devices such as cellular phones are commonly used to facilitate smuggling events in multiple ways. For example, participants use cellular phones to coordinate transportation in advance of the event and to guide migrants during the event across the border and to the waiting vehicle. In addition, smugglers utilize cellular phone to discuss and receipt proof of payment from those being smuggled. These communications may include messages received by or sent from the devices, identification numbers and other information contained in their electronic memories, and the records of telephone numbers to which calls were placed and from which calls were received. The device may also contain GPS or similar location information indicating where the devices have traveled as well as photographs or videos; many involved in illegal transportation activities often take and retain screenshots, photographs, or videos of their activities to document locations, associates, and payments. Further, individuals who commit these types of crimes together or who know about crimes committed by their close associates may communicate about those crimes through electronic communications that would be stored on a cellular telephone. Coordinators, for example, often track the migrants' and drivers' positions in real time during a smuggling event, and they exchange verbal and/or non-verbal communications over Wi-Fi and/or cellular networks to help them locate one another. These

tasks are frequently necessary in the Swanton Sector generally, and the Richford Station Area of Responsibility (AOR) specifically, because the remote and rural nature of the AOR makes it difficult to arrange meetings at precise times and to navigate to locations unlikely to appear on printed maps.

6.    The information contained within this affidavit is based upon my training and experience, my own investigative efforts, and investigation by other law enforcement officers with whom I have spoken or whose reports I have reviewed. The following is either known to me personally or has been related to me by persons having direct knowledge of the events described below. The information in this affidavit is meant to set forth probable cause to believe that the violations occurred and that evidence of them will be found on the DEVICE; it does not necessarily include every fact known to law enforcement about the events described below. Unless otherwise specified, the statements described in the following paragraphs are related in sum and substance and are not meant to be direct quotations or complete descriptions.

**Probable Cause**

7.    On December 5, 2024, at approximately 2:30 a.m., a USBP remote game camera in the woods of West Berkshire, Vermont relayed several images of multiple subjects walking southbound through the woods to observers at the Swanton Sector Dispatch. The game camera, located in the woods between VT-108 and Potato Hill Road south of the Canadian border, was placed in this location by agents with the Richford Border Patrol Station to monitor activity along the international border. Many of the subjects in the images were wearing backpacks and, although it very early in the morning and therefore dark, the subjects did not appear to be using flashlights.

3

8.     Swanton Sector Dispatch reviewed these images and notified the Richford Border
Patrol Agents of the activity and location over the service radio network. BPA Shelby Theriot
and BPA Cassandra Dablain responded to the location in their marked patrol vehicles in an effort
to intercept the subjects entering the United States. BPA Theriot parked his patrol vehicle on
Potato Hill Road facing the intersection of Potato Hill Road with VT-118 and VT-108, as
depicted in the image below. BPA Dablain parked her patrol vehicle near the intersection of VT-
120 and VT-108. With the exception of Ferland Falls Road, effectively a private driveway for
one residence, the only road intersecting with VT-108 between BPAs Theriot and Deblain is
Cross Street—a short road, less than 500 feet, that connects Potato Hill Road and VT-108 about
300 feet north BPA Theriot's position. Due to the time of day and the fresh snow, BPA Theriot
would have easily seen the headlights of any vehicles driving from Potato Hill Road to VT-108
from his surveillance location.



9.     Other Border Patrol Agents drove to the international boundary and walked to the
remote game camera. Once there, they located footprints in the fresh overnight snow showing
that a group of people had recently illegally entered the United States from Canada at a place not

4

designated for entry by immigration officers. These BPAs began following the sign and gave

continuous updates on their location and the subjects' heading to other agents via radio. The

subjects appeared to be walking almost due south and would be on track to reach VT-108

between BPA Theriot and BPA Dablain. The distance from the international border to VT-108 in

that area is between 1.5 and 2 miles.

10.   At approximately 5:00 a.m. on December 5, 2024, Supervisory Border Patrol Agent

(SBPA) Wesley Martin responded to the area in an unmarked Border Patrol truck. SBPA Martin

parked his unmarked service vehicle on VT-120 in Franklin, Vermont near the intersection of

VT-236, west of both BPA Theriot and BPA Dablain. As he was driving to that location, SBPA

Martin learned via radio that BPA Theriot had seen a large white SUV drive southeast on VT-

108 and turn south to stay on VT-108 at the Potato Hill intersection.

11.   At approximately 5:30 a.m., SBPA Martin saw a white SUV he believed to be a

Chevrolet Suburban or Tahoe drive eastbound on VT-120 toward BPA Dablain's location. SBPA

Martin notified the other BPAs of his observation. Due to the newer and clean appearance of the

SUV, SBPA Martin believed the vehicle to be a rental. Shortly thereafter, BPA Dablain saw a

white SUV drive east on VT-120 and turn onto VT-108 toward BPA Theriot. BPA Dablain

notified the other BPAs of her observation via radio. After a short time, however, BPA Theriot

had not seen the vehicle pass his location, suggesting that it stopped and/or turned around in that

stretch of VT-108. He notified the other BPAs of that via radio.

12.   SBPA Martin then drove to the area and, after passing BPA Dablain's location, saw

a white Chevrolet Suburban driving northwest on VT-108. He informed the other BPAs of his

observation via radio. SBPA Martin could clearly see the tire tracks left by the white Chevrolet

Suburban due to the fresh snow. SBPA Martin continued east on VT-108 and determined, based

5

on the tire tracks, that the white Chevrolet Suburban turned around at Ferland Falls Road. He did not, however, see any footprints indicating people had walked to VT-108 from the woods near that location yet. SBPA Martin then turned around, drove west to VT-120, and located the white Chevrolet Suburban driving west on VT-120. SBPA Martin followed the Suburban through Franklin and into Highgate. While behind the Suburban, SBPA Martin could tell the vehicle was registered in the state of Colorado, but he could not fully read the license plate characters due to snow being on the license plate.

13. SBPA Robert Rocheleau performed a stop of the white Chevrolet Suburban on VT-78 in Highgate. After the vehicle yielded, SBPA Martin requested a registration check on the vehicle (Colorado plate BHWS48) through Swanton Sector Dispatch. Record checks revealed the vehicle to be registered to Avis Budget Car Rental, LLC.

14. SBPAs Martin and Rocheleau identified themselves as Border Patrol Agents and began a roadside interview with the driver, who was the sole occupant of the vehicle. The driver was identified himself as Loveprit SINGH and provided a valid New York State Driver's License. SBPA Rocheleau questioned SINGH as to the reason he was in the area, and SINGH replied he was driving from New York City to Massachusetts and became lost after losing cell service. SBPA Martin noticed the Suburban's entertainment screen was synced to SINGH's cell phone (the DEVICE) and displaying a current active route from SINGH's location to New York City. SBPA Martin also noted that the third-row seats in the Suburban were folded flat in the "stow and go" position and that there were multiple blankets in the rear compartment. Other than the blankets, the only visible item in the vehicle was a jacket belonging to SINGH. SBPA Martin asked SINGH why the seats were folded down with blankets in the rear area, and SINGH responded it was so he could take a nap if he got tired.

6

15. SBPA Martin informed SINGH he was being detained for investigation into possible human smuggling. SINGH was searched, and SBPA Martin took a cell phone (the DEVICE) from SINGH. SINGH was transported by BPA Theriot to the Richford Border Patrol Station for further investigation. SBPA Martin placed SINGH's walled, identification, cell phone (the DEVICE), and jacket into his service vehicle and returned to the Richford Station.

16. While SBPAs Martin and Rocheleau were on the vehicle stop with SINGH, the Border Patrol Agents following the footprints through the woods in West Berkshire located eight subjects on foot just north of VT-108 near Ferland Falls Road. All subjects were determined via scene interviews to be Indian citizens who had just illegally entered the United States from Canada. The subjects were detained and transported to the Richford Border Patrol Station for further processing.

17. At the Richford Border Patrol Station, agents took the fingerprints and biographic information of the eight Indian citizens and entered them into the E3 Nextgen fingerprint database. The database returned no matches for any of the subjects having valid admission documents or for applications to enter or remain in the United States. SINGH's fingerprints and biographic information were also entered into the E3 Nextgen fingerprint database. Records were returned showing the following information:

     a.    On May 13, 2013, SINGH was encountered by the Mustang Oklahoma Police Department and cited for three traffic misdemeanors.

     b.    On January 5, 2015, SINGH was encountered by Homeland Security Investigations (HSI) in Grand Rapids, Michigan and was found to be an Alien Present without Admission or Parole. He was ordered to self-report to the HSI-Grand Rapids office on January 8, 2015; he complied, and he was released on his own recognizance

7

after processing. SINGH petitioned for asylum and still has pending immigration proceedings with a scheduled appearance in September 2025. In the interim, SINGH had applied for and obtained an Employee Authorization Document, but the document expired on September 8, 2023.

18. At the Richford Station, BPA-Intelligence David Gottschall and I interviewed one of the Indian citizens who had been found in the woods near VT-108 and Ferland Falls Road. The subject was read his *Miranda* rights and agreed to be interviewed without an attorney present. He also consented to agents searching his cellular devices.

    a.    The subject stated he contacted a smuggler through "Montreal to USA" advertisements he saw on Instagram. The subject paid the smuggler $31,500 to be illegally crossed into the United States.

    b.    The subject's phone contained conversations in WhatsApp regarding his illegal entry into the United States.

    c.    The subject had been instructed to download Life360 application, which provided the smuggler(s) live updates to his location as he was walking. The smuggler(s) used the location information to direct the subjects' movements through the woods in Canada and the United States.

    d.    The subject stated a person from New York City was to pick him up, but the subject did not have any details concerning the person or vehicle picking him up.

19. SINGH declined to be interviewed at the Richford Border Patrol Station.

20. On December 13, 2024, I received a response from Avis Budget Car Rental, LLC with records regarding the rental of the Chevrolet Suburban and the renter's previous rental history. The vehicle had been rented by Satpal Singh for the period of December 4 to December

8

6, 2024. Based on a Border Patrol intelligence analyst's review of Accurint database entries, Satpal Singh appears to likely be a family member of Loveprint SINGH. I note that the rental records also indicate Satpal Singh had previously rented several vehicles from Avis Budget Car Rental on three previous occasions since the end of November 2024: a white Ford Expedition from November 30 to December 1, 2024, returned with 765 miles; a white Chevrolet Suburban from December 1 to December 2, 2024, returned with 710 miles; and a white Chevrolet Suburban from December 3 to December 4, 2024, returned with 925 miles. All four rentals were rented from and returned to LaGuardia Airport in Flushing, New York. I note that it is approximately 380 miles (760 miles round trip) from LaGuardia Airport to West Berkshire, Vermont, according to Google Maps.

### Information Regarding Electronic Storage and Forensic Analysis

21.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

22.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant but also forensic evidence that establishes how the DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the DEVICE because data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has

9

used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

23. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the DEVICE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

### Conclusion and Request

24. Based on the foregoing, I submit there is probable cause to believe that on December 5, 2024, Loveprit SINGH conspired and attempted to transport aliens in furtherance of their illegal entry while knowing or recklessly disregarding the fact that they were aliens who had

10

illegally entered the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and 8 U.S.C. § 1324(a)(1)(A)(v)(I). Further, there is probable cause to believe that evidence of these violations will be located inside the DEVICE. I respectfully request the issuance of a search warrant authorizing the examination of the DEVICE, further described in Attachment A, and the seizure therefrom of the data described in Attachment B.

25.  Because this warrant seeks only permission to examine the DEVICE, which is already in law enforcement's possession, the execution of this warrant would not involve the physical intrusion onto premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

11

Dated at Burlington, in the District of Vermont, this __18__ day of December, 2024.

Attested to by reliable electronic means
NATHANIEL J. ARNOLD
Border Patrol Agent
U.S. Border Patrol

Attested and sworn to before me by reliable electronic means (Microsoft Teams) on this __18th__ day of December, 2024.

_____
HON. KEVIN J. DOYLE, Magistrate Judge
United States District Court
District of Vermont

12